No. 19-1314

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

———————————————

REBECCA FOSTER,

*Plaintiff/Appellant,*

*v.*

THE BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN; UNIVERSITY OF MICHIGAN; ALISON DAVIS-BLAKE,

*Defendants/Appellees.*

———————————————

FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION
CASE NO 2:17-cv-10781
HON. BERNARD A. FRIEDMAN

———————————————

## APPELLEES' PETITION FOR
## REHEARING EN BANC

———————————————

Stephen J. Cowen
Amanda K. Rice
Andrew J. Clopton
JONES DAY
150 W. Jefferson St., Suite 2100
Detroit, MI 48226
(313) 230-7954
scowen@jonesday.com

*Counsel for Petitioners/Appellees*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

RULE 35(b)(1) STATEMENT ................................................................. 1

INTRODUCTION ................................................................................... 2

BACKGROUND ..................................................................................... 4

ARGUMENT .......................................................................................... 8

I.    The Majority Opinion Conflicts with Supreme Court and Sixth Circuit
      Precedent ..................................................................................... 8

II.   The Majority Opinion Creates a Circuit Split .............................. 12

III.  This Issue is Exceedingly Important ........................................... 14

CONCLUSION ..................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Campbell v. Dundee Cmty. Schs.*,
    661 F. App'x 884 (6th Cir. 2016) ........................................................1

*City of Canton v. Harris*,
    489 U.S. 378 (1989) ........................................................................14

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ................................................................passim

*Doe v. Baum*,
    903 F.3d 575 (6th Cir. 2018) ...........................................................14

*Doe v. Claiborne Cty.*,
    103 F.3d 495 (6th Cir. 1996) ...........................................................14

*Doe v. Galster*,
    768 F.3d 611 (7th Cir. 2014) .....................................................12, 13

*Doe v. Univ. of Mich.*,
    No. 2:18-cv-11776, Dkt. 93 (E.D. Mich. Mar. 23, 2020)...................16

*Foster v. Univ. of Mich.*,
    2019 WL 764256 (E.D. Mich. Feb. 21, 2019)............................passim

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)........................................................................14

*Karasek v. Regents of the Univ. of Cal.*,
    948 F.3d 1150 (9th Cir. 2020) ...................................................12, 13

*M.D. ex rel. Deweese v. Bowling Green Indep. Sch. Dist.*,
    709 F. App'x 775 (6th Cir. 2017) ...............................................10, 15

*Mathis v. Wayne Cty. Bd. of Educ.*,
496 F. App'x 513 (6th Cir. 2012) ................................................................10, 11

*McCoy v. Bd. of Educ., Columbus City Schs.*,
515 F. App'x 387 (6th Cir. 2013) ...................................................................9, 11

*Mitts v. Bagley*,
626 F.3d 366 (6th Cir. 2010) ...............................................................................3

*Pahssen v. Merrill Cmty. Sch. Dist.*,
668 F.3d 356 (6th Cir. 2012) ...............................................................................9

*Patterson v. Hudson Area Schs.*,
551 F.3d 438 (6th Cir. 2009) .............................................................................10

*Stiles ex rel. D.S. v. Grainger Cty.*,
819 F.3d 834 (6th Cir. 2016) ..........................................................................9, 11

*Vance v. Spencer Cty. Pub. Sch. Dist.*,
231 F.3d 253 (6th Cir. 2000) ................................................................10, 11, 15

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
477 F.3d 1282 (11th Cir. 2007) .........................................................................13

*Zeno v. Pine Plains Cent. Sch. Dist.*,
702 F.3d 655 (2d Cir. 2012) ..............................................................................13

**OTHER AUTHORITIES**

Fed. R. App. P. 35(b)(1) .......................................................................................1

## <u>RULE 35(b)(1) STATEMENT</u>

Petitioners the Board of Regents of the University of Michigan and the University of Michigan [1] ("the University") respectfully submit that this case satisfies the criteria for en banc review.  The "deliberate indifference" standard applied by the panel majority conflicts with the standard endorsed by the Supreme Court and previously applied by this Court and other Courts of Appeals.  *See* Fed. R. App. P. 35(b)(1)(A)–(B); *infra* Parts I, II.  Moreover, the meaning of "deliberate indifference" is a "question[] of exceptional importance" to schools, who must attempt to comply with conflicting decisions by this Court, and to students, who have rights both to full and fair processing of sexual-assault allegations and to due process in the face of such allegations.  *See* Fed. R. App. P. 35(b)(1)(B); *infra* Part III.

---

[1] Plaintiff also named former dean Alison Davis-Blake as a Defendant. But "Title IX does not permit individual liability against school officials for sexual harassment." *Campbell v. Dundee Cmty. Schs.*, 661 F. App'x 884, 888 (6th Cir. 2016).

## INTRODUCTION

Plaintiff Rebecca Foster was the victim of sexual harassment and stalking perpetrated by one of her classmates ("Respondent").    That behavior is not tolerated at the University of Michigan, and the University has every sympathy for what Plaintiff experienced.    Indeed, the University promptly investigated Plaintiff's allegations; took affirmative, escalating steps to protect her during the course of that investigation; and imposed sanctions on Respondent.

This case is about whether the University was "deliberately indifferent" in adopting interim measures to respond to Plaintiff's allegations, and whether such "deliberate indifference" caused Plaintiff to suffer further harassment.    The University's interim measures included a no-contact order; classroom accommodations and transfer options; exclusion of Respondent from the final class session and his commencement ceremony; and extensive coordination with campus police, who assigned plain-clothes officers to protect Plaintiff during commencement and ultimately arrested Respondent—all in the course of just weeks.    The district court found, as a matter of law, that it would be "simply impossible" "to characterize [the University's] response as 'deliberately indifferent' or 'clearly unreasonable.'"    *Foster v. Univ. of Mich.*, 2019 WL 764256, at *15 (E.D. Mich. Feb. 21, 2019) (Friedman, J.).    But the panel majority disagreed,

second-guessing the University's decisions at every turn and speculating, with the benefit of hindsight, about what the University *might* have tried to do differently.

The majority opinion is simply wrong:  As the Supreme Court has made clear, courts are not free to "second-guess[] the disciplinary decisions made by school administrators."  *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).  Recognizing, however, that "simply wrong" does not generally suffice to warrant en banc review, *see, e.g.*, *Mitts v. Bagley*, 626 F.3d 366, 369–71 (6th Cir. 2010) (Sutton, J., concurring in denial), what matters for present purposes is that the majority's "deliberate indifference" standard is irreconcilable with the one endorsed by the Supreme Court and previously applied by this Court and other Courts of Appeals.  Let lie, that intra- and inter-circuit conflict will sow chaos among district courts.  And it will leave institutions of higher education—who are already facing an onslaught of litigation brought *both* by alleged victims *and* by alleged perpetrators—in a truly impossible position.  Indeed, and as Judge Sutton presciently remarked, "one wonders when the day will come that two different juries will find that the same school loses coming and going over the same incident—by insufficiently protecting the rights of the victim in one case and by insufficiently protecting the rights of the accused in the other."  Slip Op. at 36.

This Court should rehear this case en banc, restore uniformity to the law of this Circuit, and provide sorely needed guidance to district courts and to the

schools doing their level best to meet their obligations under Title IX and the Due

Process Clause of the Constitution.

## <u>BACKGROUND</u>

This case is about the adequacy of the University's actions "during the

seven-week period between March 13, 2014 (when [P]laintiff first reported the

harassment to the university) and May 1, 2014 (when [Respondent] was arrested

and plaintiff graduated from the . . . program)." *Foster*, 2019 WL 764256, at \*3.

Those actions included:

- March 13, 2014:  The day Plaintiff reported harassment, "the university's deputy Title IX coordinator" "emailed [P]laintiff a complaint form and a link to the university's sexual misconduct policy and indicated she would contact [P]laintiff again after receiving" Plaintiff's submission.  *Id.* at \*3.

- March 17, 2014:  University investigator Rebecca Veidlinger "asked Plaintiff to provide her with copies of the text messages [P]laintiff had received from the harasser." *Id.*

- March 18, 2014:  When Plaintiff provided those copies and expressed concern about attending an online class with Respondent, Veidlinger "responded immediately," advising Plaintiff that she understood Plaintiff's concerns and was working to address them.  *Id.*

- March 19, 2014:  Veidlinger informed Plaintiff that she had notified the professor, directed the professor not to mention student names, and reassured Plaintiff that her "presence [would] not be known to other students" during the online class.  *Id.* at \*4.

- March 21, 2014:  Veidlinger instructed Respondent that he was "to have no contact with [Plaintiff]" and that he was forbidden from "retaliat[ing] in any way."  *Id.*

- March 25, 2014:  Veidlinger interviewed Respondent.  *Id.*

- March 28, 2014:  Veidlinger informed the program director of interim measures for the upcoming April 3–5 class sessions, which included maintaining the "no contact" order, arranging for Respondent to stay at a different hotel, excluding him from communal meals, ensuring that Plaintiff would not be seated near or placed on a team with Respondent, and providing Plaintiff direct access to an administrator who would "always be present and available."  *Id.*

- March 29, 2014:  Plaintiff informed Veidlinger that Respondent had sent her a one-word text message ("Really."); Veidlinger responded within hours.  *Id.* at *5.

- March 31, 2014:  Veidlinger reminded Respondent of the "no contact" order; Respondent said the message had been a mistake and apologized; and Respondent did not send any further text messages to Plaintiff.  In addition, Plaintiff and Respondent were separately advised of the measures being taken for the April class sessions.  *Id.* at *5–7.

- April 1, 2014:  Veidlinger addressed Plaintiff's questions and concerns regarding those measures.  Veidlinger offered Plaintiff and Respondent the opportunity to attend the final class sessions in Ann Arbor, rather than Los Angeles.  Both declined.  *Id.* at *6, *8.

- April 4, 2014:  Classes resumed.  *Id.* at *8.

- April 5, 2014:  Plaintiff notified administrators that Respondent had posted about her on Facebook.  Within hours, administrators informed Respondent that he was no longer permitted to attend class or appear on premises.  *Id.* at *9.

- April 10, 2014:  After Respondent sent a series of aggressive emails to University employees, the University informed him that he would not be permitted to attend commencement, alerted campus police, and requested a "threat assessment."  *Id.* at *9–10.

- April 11, 2014:  Plaintiff's professor granted her extra time to complete an assignment in light of the harassment.  *Id.* at *11.

- April 16, 2014:  Respondent's lawyer informed the University that Respondent would not attend commencement.  *Id.*

- April 28, 2014: In an abundance of caution, the University sent photographs of Respondent to campus police and requested the presence of plain-clothes officers to protect Plaintiff at commencement events. *Id.*

- April 29, 2014: Plaintiff informed the University that she believed Respondent was traveling to Ann Arbor. Campus police distributed Respondent's photos to hotel staff. That evening, Plaintiff saw Respondent's reflection through glass in the hotel lounge, and went immediately to the officer assigned to protect her. The officer escorted Respondent out of the building. *Id.* at *11–12.

- April 30, 2014: Campus police obtained court confirmation that a temporary restraining order Plaintiff had obtained in Los Angeles was enforceable in Michigan. That same night, officers located and arrested Respondent. *Id.* at *12.

- May 1, 2014: Campus police transported Respondent to the airport and "place[d] him on a flight back to California." *Id.*

The University completed its sexual misconduct investigation shortly thereafter, concluded that Respondent had violated the University's policies, and imposed sanctions against him. *Id.*

Nearly three years later, Plaintiff filed suit, seeking money damages from the University under Title IX. (R.1; R.18.) The district court denied the University's motion to dismiss. (R.32.) After discovery, however, it granted summary judgment to the University. Because the University "responded immediately and effectively to plaintiff's complaints and to the harasser's texts, emails, and other actions," the court wrote, "it would be *simply impossible* for any reasonable jury to characterize [its] response as 'deliberately indifferent' or 'clearly unreasonable.'" *Foster*, 2019 WL 764256, at *15 (emphasis added).

On appeal, the panel majority found the "simply impossible," "possible." At each juncture, the panel second-guessed the scope, timing, and purpose of the steps the University took to protect Plaintiff. *See* Slip Op. at 21–27. And it repeatedly speculated about other actions the University *could* have taken—despite acknowledging that "it was possible that taking" other actions "would not have been feasible or proper in the absence of a formal finding by the University that [Plaintiff's] complaint had merit." *Id.* at 26; *see, e.g.*, *id.* at 25 ("The University could have barred the respondent from attending commencement at this point, rather than waiting until April 10; it could have instituted measures to ensure Foster's safety in the Los Angeles area; and it could have taken further disciplinary measures against the respondent[.]"); *id.* at 26 ("The University could have . . . institut[ed] a no-trespass order at the Executive Residence against the respondent [or] plac[ed] him on interim suspension[.]"). It further concluded that the University's failure to take those speculative actions caused Plaintiff to suffer additional harassment. *Id.* at 27–28.

Judge Sutton dissented. He would have held that "the University of Michigan did not show deliberate indifference to Foster." *Id.* at 32. The majority's contrary ruling, he demonstrated, is irreconcilable with this Court's precedents. *See id.* at 35. And it leaves universities in an untenable position wherein the same conduct could subject them to liability both to the victim and to

the accused.  *See id.* at 36.  Judge Sutton also would have held that Plaintiff could not establish causation, emphasizing that, "[u]nder Title IX, a school may be held liable only for what it can control."  *Id.* at 38.

## **ARGUMENT**

### I.     **The Majority Opinion Conflicts with Supreme Court and Sixth Circuit Precedent.**

In *Davis*, the Supreme Court held that schools receiving federal funding can be liable for damages under Title IX when they are "'deliberately indifferent' to acts of student-on-student harassment."  526 U.S. at 648.  The Court took care, however, to emphasize that schools can be considered "deliberately indifferent" to such acts "*only* where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances."  *Id.* (emphases added).  That standard "is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action."  *Id.* at 649.  And it can support liability "only where the [school] has some control over the alleged harassment."  *Id.* at 644.

Before this case, this Court carefully abided the Supreme Court's instructions.  Unfortunately, the "deliberate indifference" standard the majority applied bears no resemblance to the standard endorsed by the Supreme Court in *Davis* and previously applied by this Court.

On the one hand, this case is indistinguishable from—and, in many respects,

stronger than—those in which this Court found that a school had *not* been

"deliberately indifferent."  For example:

- In *Pahssen v. Merrill Community School District*, 668 F.3d 356 (6th Cir. 2012), this Court held that no reasonable jury could find deliberate indifference where a student alleged that she had been sexually harassed on "three separate occasions"; the school halted the harassment for 30 days by providing "adult supervision"; and, after the school abandoned those effective measures, the perpetrator "sexually assaulted [the victim] on school grounds." *Id.* at 360.

- In *McCoy v. Board of Education, Columbus City Schools*, 515 F. App'x 387 (6th Cir. 2013), this Court held that no reasonable jury could find deliberate indifference where a student alleged that a teacher had touched students inappropriately over a period of years; the school gave just two formal warnings; the teacher continued to touch students, including by "fondling [a student's] genitals"; and the teacher ultimately pled guilty to "gross sexual imposition." *Id.* at 389.

- In *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834 (6th Cir. 2016), this Court held that no reasonable jury could find deliberate indifference where a student had been physically bullied seriously enough to cause him to suffer "a compression fracture"; the victim "and his mother repeatedly complained to school officials"; administrators on at least one occasion "did not discipline" a perpetrator; and the harassment "culminat[ed] in an attack in the school bathroom that led [the victim] to transfer to another school." *Id.* at 840–42.

- In *M.D. ex rel. Deweese v. Bowling Green Independent School District*, 709 F. App'x 775 (6th Cir. 2017), this Court held that no reasonable jury could find deliberate indifference where a high-school student alleged that a teammate had "sexually assaulted her as they traveled home from a competition"; the teammate was suspended but then allowed to return to school provided he had no contact with the victim; but "the administrators did not manage to prevent every encounter" between the two students and those encounters caused the victim "considerable anxiety." *Id.* at 776–77.

-9-

On the other hand, merely "[t]o describe the facts in . . . cases" where this Court *did* find "deliberate indifference" "is to distinguish them from Foster's case." Slip Op. at 35 (Sutton, J., dissenting).  For example:

- In *Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000), this Court held that a reasonable jury could find deliberate indifference where a middle school student had been "propositioned or touched inappropriately in virtually every class" for more than a year; the administration did not conduct a Title IX investigation; no one "disciplined the offending students [or] informed law enforcement"; and "the more [the victim] complained" the more "the harassment seemed to increase." *Id.* at 257, 261.

- In *Patterson v. Hudson Area Schools*, 551 F.3d 438 (6th Cir. 2009), this Court held that a reasonable jury could find deliberate indifference where a middle-school student had been "repeatedly harassed over a number of years"; that "pervasive harassment escalated to criminal sexual assault"; and the school identified a "system that successfully combated the harassment" but discontinued that system in favor of demonstrably ineffective "verbal reprimands." *Id.* at 448–49.

- In *Mathis v. Wayne County Board of Education*, 496 F. App'x 513 (6th Cir. 2012), this Court held that a reasonable jury could find deliberate indifference where a middle-school student had repeatedly been sexually harassed and assaulted by classmates; the school "took little to no immediate action to protect" the victim; "did not conduct any substantive investigation"; did not "promptly punish the behavior"; and, instead, allowed the victim to "be subjected to interacting with [the perpetrators] in close quarters on a daily basis." *Id.* at 514, 516.

In each of these cases, this Court was careful to heed the Supreme Court's instruction that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648; *accord, e.g.*, *Stiles*, 819 F.3d at 849; *Vance*, 231 F.3d at 260.  It recognized that schools are

"not required to 'remedy' sexual harassment" and "[v]ictims do not have a right to particular remedial demands." *Vance*, 231 F.3d at 260.  And it emphasized that whether a school could "have done more . . . is not the standard by which we impose liability." *McCoy*, 515 F. App'x at 392.  Instead, it allowed a "deliberate indifference" claim to proceed only where the school's actions were "*clearly* unreasonable." *Davis*, 526 U.S. at 648 (emphasis added).  And, in evaluating the reasonableness of the school's actions, this Court carefully balanced "the strength of the school's remedial response, the nature of the harassment allegations the school confronted, and the period of time the harassment persisted." *Stiles*, 819 F.3d at 850.

To be sure, the panel majority recited some of these principles.  But that only makes its failure to faithfully apply them *more* troubling, as it threatens to turn important limiting principles into meaningless incantations.  Unless this Court acts, every Title IX plaintiff in this Circuit will cite *Foster* as pointing in precisely the opposite direction of the jurisprudential guideposts this Court had previously taken such care to maintain.  And district judges will be left holding the bag, with no choice but to attempt the impossible task of trying to reconcile irreconcilable precedents.

## II.   The Majority Opinion Creates a Circuit Split.

The "deliberate indifference" standard applied in *Foster* is also night-and-day from the standard applied by other Courts of Appeals, all of which adhere to the principles enumerated in *Davis* and previously applied by this Court.

Other Courts of Appeals have consistently rebuffed "deliberate indifference" claims where the defendants were not clearly unreasonable in responding to student harassment.  For example, in *Karasek v. Regents of the University of California*, 948 F.3d 1150 (9th Cir. 2020), a university waited months before disciplining a student accused of sexual assault, failed to follow its own policies, and failed to impose interim measures.  *Id.* at 1163–66.  Similarly, in *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014), a middle school student was harassed over a period of years and the school "took measures to reduce contact" between the student and the harassers but did not "grant her request to transfer to a different school" or finally expel the harassers until the victim had incurred serious injuries. *See id.* at 614–22.  In both cases, the courts emphasized that "[f]ederal law gives school officials wide discretion in making disciplinary decisions, especially as they have to balance the interests of all concerned."  *Id.* at 621; *see Karasek*, 948 F.3d at 1162 (quoting *Davis*, 526 U.S. at 648).

On the other side of the ledger, other Courts of Appeals have found deliberate indifference almost exclusively where the defendant ignored student

misconduct or where a school's response was clearly disproportionate to severe, long-term harassment.  In *Zeno v. Pine Plains Central School District*, 702 F.3d 655 (2d Cir. 2012), for example, a high-school student was subjected to severe race-based harassment over a period of years; the school knew that the disciplinary measures it had taken "did not deter" the harassment; and the school "dragged its feet" for "a year or more" "before implementing any non-disciplinary remedial action." *Id.* at 659–63, 669–70.  And in *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), a university student alleged that she had been raped by multiple classmates; the university was aware that one of those classmates had a history of criminal sexual assault and yet placed him "in a student dormitory and fail[ed] to supervise him"; but the university "waited almost eleven months to take corrective action." *Id.* at 1296–97.  In these cases and others, the schools' refusal to act over a period of months or years contrasts sharply with the University's immediate and escalating response over a period of days and weeks.

These cases are fully in line with the Supreme Court's decision in *Davis* and this Court's prior rulings.  With respect, *Foster* is not.[2]

---

[2] The majority opinion is even more of an outlier when one considers other contexts in which the "deliberate indifference" standard is applied.  The Supreme Court has noted, for example, that "[c]omparable considerations led to [the] adoption of a deliberate indifference standard" for Title IX and "for claims under

### III.    This Issue Is Exceedingly Important.

For universities and the students entrusted to their care, the stakes in this case could hardly be higher. Universities often act as first responders for students suffering sexual and other harassment at the hand of their classmates. As such, they bear a solemn responsibility, both ethical and legal, to protect their students from harassment. The University of Michigan takes that responsibility exceedingly seriously.

But as this Court has recently emphasized in another case involving the University, *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), schools must protect the victims of sexual harassment while respecting the constitutional rights of the accused. Day in and day out, schools must make "judgment calls about how best to balance those competing interests." *M.D.*, 709 F. App'x at 778. And it is not the role of the courts to "second guess" those judgments, *Vance*, 231 F.3d at 260—particularly where a school lacks the ability to control the harassment, *Davis*,

---

§ 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)). But the majority opinion's version of "deliberate indifference" looks nothing like the standard applied in other contexts. *See, e.g.*, *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996) (citing *City of Canton*, 489 U.S. at 389) ("'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to sexual abuse.").

526 U.S. at 644.  After all, in nearly all cases a court will be able to identify, with the benefit of hindsight, an alternative approach a school might have taken.

The "deliberate indifference" standard exists for exactly that reason.  It was intended to be "sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action."  *Id.* at 649.  And it "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action."  *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 648).  Above all—and as "[t]he Supreme Court has pointedly reminded us"—"deliberate indifference" "is not a mere 'reasonableness' standard that transforms every school disciplinary decision into a jury question."  *Id.* (quotation marks omitted).

With *Foster* on the books, however, district courts will have little choice but to try almost every "deliberate indifference" case that comes before them.  And it will not be long before Judge Sutton's prophecy actually comes to pass:  "[If] [this Court] dilute[s] deliberate indifference into mere reasonableness," as the panel majority has done, "two different juries" could "find that the same school loses coming and going over the same incident—by insufficiently protecting the rights of the victim in one case and by insufficiently protecting the rights of the accused in the other."  Slip Op. at 36 (Sutton, J., dissenting).  Indeed, two days ago, a

district court held that "[i]mposing a suspension, prior to a hearing and adjudication," "is unconstitutional"—yet the panel majority here held that a reasonable jury could find the University's failure to take *that very step* was "clearly unreasonable." *Compare Doe v. Univ. of Mich.*, No. 2:18-cv-11776, Dkt. 93 at 29 (E.D. Mich. Mar. 23, 2020) (citing *Baum*, 903 F.3d at 581), *with* Slip Op. at 26 ("The University could have . . . [imposed] [a]n interim suspension[.]"). That is exactly the result "deliberate indifference" was designed to prevent. *See Davis*, 526 U.S. at 549.

## CONCLUSION

The University respectfully requests that the Court rehear this case en banc.


Dated:  March 25, 2020

Respectfully submitted,

*/s/ Stephen J. Cowen*
Stephen J. Cowen
Amanda K. Rice
Andrew J. Clopton
JONES DAY
150 W. Jefferson St., Suite 2100
Detroit, MI 48226
(313) 230-7954
scowen@jonesday.com

*Counsel for Petitioners/Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2)(A) and 40(b)(1) because it contains 3,898 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1).

2.    I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Andrew J. Clopton*
Andrew J. Clopton

*Counsel for Petitioners/Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2020, this Petition for Rehearing En Banc was filed with the United States Court of Appeals for the Sixth Circuit via the Court's ECF system.  Counsel of record will receive notice of, and be able to access, the filing via the ECF system.


<u>*/s/ Andrew J. Clopton*</u>
Andrew J. Clopton

*Counsel for Petitioners/Appellees*

# EXHIBIT A

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

REBECCA FOSTER,

*Plaintiff-Appellant,*

*v.*

THE BOARD OF REGENTS OF THE UNIVERSITY OF
MICHIGAN; UNIVERSITY OF MICHIGAN; ALISON DAVIS-
BLAKE,

*Defendants-Appellees.*

No. 19-1314

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-10781—Bernard A. Friedman, District Judge.

Argued: December 4, 2019

Decided and Filed: March 11, 2020

Before: MOORE, CLAY, and SUTTON, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellant.
Brian Schwartz, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan,
for Appellees. **ON BRIEF:** Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for
Appellant. Brian Schwartz, Jacob Hogg, MILLER, CANFIELD, PADDOCK AND STONE,
P.L.C., Detroit, Michigan, for Appellees.

MOORE, J., delivered the opinion of the court in which CLAY, J., joined. SUTTON, J.
(pp. 32–38), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge.  Plaintiff-Appellant Rebecca Foster appeals the district court's grant of summary judgment in favor of Defendants-Appellees Board of Regents of the University of Michigan, the University of Michigan, and Alison Davis-Blake (collectively, the "University") on her deliberate-indifference claim under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688.  Foster was the victim of sexual harassment during a University of Michigan Ross School of Business executive MBA program located off-site in Los Angeles, California.  After Foster reported that the respondent, a fellow classmate in the program, had sexually harassed her, the University instituted a no-contact and no-retaliation order against him while it investigated her complaint.[1]  Foster argues that the University's response to the respondent's unwillingness to comply with these measures was clearly unreasonable and caused her to undergo further harassment.

Because we believe that Foster has established a genuine issue of material fact as to whether the University was deliberately indifferent to the sexual harassment she suffered at the hands of a fellow student, we **REVERSE** the grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

Foster and the respondent were both part of an off-site executive MBA ("EMBA") program based in Los Angeles through the University of Michigan Ross School of Business.  As part of the program, the students occasionally took part in "residencies," which were once-a-month, weekend educational sessions at the Beverly Wilshire hotel in Beverly Hills.  R. 48-2 (Foster Dep. at 90–91) (Page ID #951).  The students would check in to the hotel on Thursday night, take part in all-day sessions on Friday and Saturday, and check out on Saturday night.  *Id.*

———————————

[1]This opinion refers to the accused student as the "respondent."

## A. Pre-Report Background

Foster developed a friendship with the respondent in the fall of 2012 through the spring of 2013. R. 48-10 (Office for Institutional Equity ("OIE") Investig. Rep. at 1) (Page ID #996). She did not have a dating or sexual relationship with the respondent. *Id.* The respondent began sending complimentary texts to Foster in May 2013, *id.* at 2, and began expressing a "more intense and romantic interest in her" in September 2013, *id.* at 3. At this time, he began giving her unsolicited gifts, informing her that she "h[e]ld beguiling power over [him]," and suggesting he wished to date or marry her. *Id.* On multiple occasions, the respondent made unwanted physical contact with Foster, as follows:

- During the December 2013 residency, the respondent grabbed Foster's butt as she walked away from an elevator. *Id.* at 4.

- While they attended a football game over the winter holiday (the Phoenix bowl), the respondent "rubbed her leg/put a hand on her knee." *Id.*

- On New Year's Eve 2013, while Foster, the respondent, and two classmates visited the Griffith Park Observatory, the respondent "grabbed her and kissed her forcefully on the cheek." *Id.* at 4–5.[2]

- On January 8, 2014, during the EMBA program's monthly residency, the respondent brought coffee to Foster's hotel room, and Foster told him to leave her alone and get out, but instead he climbed into bed with her and attempted to force himself on her. *Id.* at 5; R. 48 (Foster Dep. at 117) (Page ID #680). Foster then got out of bed, went into the bathroom, closed the door, and undressed to shower. OIE Investig. Rep. at 5. The respondent then opened the door, entered the bathroom while Foster was naked, and pulled his pants down. *Id.* Foster demanded he leave her room, and he left. *Id.*

- On February 7, 2014, during another residency, the respondent again brought coffee to Foster's hotel room, and after Foster answered the door, she returned to bed and told the

---

[2]OIE Investigator Rebecca Veidlinger confirmed that Foster indicated to her that the Phoenix bowl game incident and the Griffith Park incident were both examples of "unwanted sexual contact." R. 44-4 (Veidlinger Dep. at 57–58) (Page ID #736).

respondent to leave multiple times. *Id.* at 6. The respondent then climbed into bed and tried to—in his words—"schnuggle" with her from atop the covers. *Id.*[3]

In addition to this unwanted physical contact, between September 2013 and February 2014, the respondent repeatedly expressed romantic feelings for Foster, despite her clearly rejecting his advances and informing him that she wanted a platonic friendship. *Id.* at 3–6. On February 28, 2014, after receiving a series of messages from the respondent regarding his perception of their failed relationship, Foster called the respondent, told him that he should seek professional help, and "asked him not to talk to her about his romantic interest in her anymore." *Id.* at 7. After the respondent sent Foster several text messages on March 9 and 10, to which she did not respond, the respondent sent her a message on March 11, stating, "Do I creep you out?;)" *Id.* Foster responded: "No. You're scaring me and I want this to stop." *Id.* The two exchanged several messages thereafter, with Foster accusing him of "trivializing the way" she felt. *Id.*

## B. The March Report and Pre-April Residency Response

On March 13, 2014, Foster first reported that the respondent had sexually harassed her to the University's Office of Institutional Equity ("OIE") and the Ross School. R. 44-7 (Heatlie 3/13/14 email) (Page ID #772). Over the next few days, OIE and Title IX Coordinators from the University were in touch with Foster to interview her and collect documentation corroborating her report. On March 18, 2014, Foster provided OIE with over 300 screenshots of over 900 text messages the respondent had sent to her and evidence of gifts and letters she had received from him. She also raised concerns about an online school session taking place the next day; specifically, she did not want the respondent to know she was attending the session. R. 44-7 (Foster 3/18/14 email) (Page ID #770). OIE Investigator Rebecca Veidlinger informed Foster the next day that she had made arrangements with the session's professor to ensure that Foster's concerns would be addressed. R. 44-8 (Veidlinger 3/19/14 email) (Page ID #774). The online class took place without incident.

---

[3]Foster initiated physical contact with the respondent on one occasion: On January 6th, when she was "tired and worn down," she kissed him and the kiss lasted for approximately ten seconds; she made an excuse to end the kiss. OIE Investig. Rep. at 5.

On March 21, 2014, Veidlinger contacted the respondent to schedule a meeting to discuss Foster's allegations.  R. 44-12 (Veidlinger 3/21/14 email #1) (Page ID #780).  In a subsequent email that day, Veidlinger finalized plans for this meeting and stated:

> In the meantime, you are instructed to have no contact with Rebecca Foster.  This includes direct and indirect contact, and includes contact in person, by email, by text message, by phone, or through a third party.  In addition, as you read in the Student Sexual Misconduct Policy, the University prohibits retaliation of any kind so you are instructed not to retaliate in any way.[4]

*Id.* at 779.  While it began to investigate Foster's complaint, the University developed a set of interim accommodations in response to her concerns.  One accommodation the administrators discussed internally, on March 28, was where the respondent would stay and eat during the upcoming April residency.  *See* R. 48-12 (OIE-Ross emails) (Page ID #1023–25).

On Saturday, March 29 at 11:45 p.m., the respondent sent a text message to Foster that stated, "Really".  R. 48-13 (Text message) (Page ID #1026).  That same night, Foster notified Veidlinger of the message, stating that it was "very distressing" and asking, "Should I make further arrangements for my safety at this point?"  R. 48-14 (Foster 3/30/14 email) (Page ID #1027).  The next morning, Sunday, March 30, Veidlinger responded:  "I will address this text with [the respondent] tomorrow.  As to your safety, you are the best judge of your immediate needs.  Please keep me informed if he makes any other contact."  *Id.*

On Monday, March 31, Claire Hogikyan, Managing Director for the EMBA program, sent Foster and the respondent separate emails enumerating a list of accommodations for the April residency, which would begin in a few days.  The email to the respondent included the following details:

- The respondent would stay at a different hotel from the one where the residency would be held and where Foster would be staying.

- The respondent would be "required to put [his] food on a plate or in a to-go container and eat in a separate location outside of the Le Petit Trainon dining room."

---

[4] This instruction is hereinafter referred to as the "no-contact order."

- The respondent was prohibited from "attending any social activities outside of the scheduled classes where Rebecca Foster is in attendance."

- The respondent was prohibited from interacting with Foster "in any way during class."

R. 48-16 (Hogikyan 3/31/14 email) (Page ID #1030).  Hogikyan also stated that she would be present during the residency "to ensure compliance with these measures." *Id.*  The email to Foster was similar in substance, with fewer details.  Hogikyan added in the email to Foster that Nirav Mehta, a University professor, would be present during class and would "make sure that [the respondent] is seated appropriately out of your sight."  R. 48-15 (Hogikyan 3/31/14 email) (Page ID #1029).

Foster was unsatisfied with these accommodations.  In correspondence with Veidlinger that day, Foster stated that the accommodations "do not address my safety" and that she did not want to be in the same room as the respondent during the upcoming residency.  R. 48-17 (Foster 3/31/14 email) (Page ID #1032).  She reiterated that the respondent had violated the no-contact order with his March 29 text message.  Foster also inquired 1) how she was expected to handle class participation, including speaking in class; 2) how to manage breaks during class sessions, given that, for example, she would have to cross the respondent's path every time she wished to use the bathroom; 3) how the University would address her desire not to see him and for him not to see her, including at social functions; and 4) whether the respondent was able to discuss with others the investigation and why his accommodations had changed for the April residency.  *Id.*

Approximately twenty-four hours later, on Tuesday, April 1, Veidlinger responded to each of the points raised in Foster's email as follows:

1. She assured Foster that she would not be called upon to speak in front of the respondent and that non-participation in the residency would not affect her grade.

2. She noted that "it is possible, given the concentrated nature of the residency classes, that the Respondent and you might have some incidental contact at break time." Veidlinger suggested that "contact can be avoided if you use the bathroom in your room."

3. She reiterated that the no-contact order required the respondent to leave a social function if Foster were present. She suggested that, in light of Foster's discomfort, "you may choose not to attend a social function if you know he is already there."

4. She explained that both parties were permitted to discuss the investigation.

R. 48-18 (Veidlinger 4/1/14 email) (Page ID #1033). Veidlinger also indicated that she had spoken with the respondent the day before (March 31) about his apparent violation of the order through the text message he had sent to Foster: "He said it was intended to go to someone else, that he mistakenly texted you, and that he was sorry to have done that. We went over the no contact and retaliation provisions and I do not expect anything like that to happen again." *Id.* In a phone conversation with Hogikyan that same day, Foster requested in-classroom security, which Hogikyan denied. R. 48-2 (Foster Dep. at 166, 185) (Page ID #958, 961). According to Foster, Hogikyan explained that she didn't want to "escalate the situation." *Id.* at 166–68 (Page ID #958). Also on April 1, the University conveyed an offer to both Foster and the respondent to attend the upcoming residency in Ann Arbor instead of Los Angeles; both parties declined. R. 48-3 (Hogikyan Dep. at 45–46, 65, 69) (Page ID #974–76).

**C. The April Residency**

The April 2014 residency began on the evening of Thursday, April 3, and the students had a class session from 5:00 to 7:30 p.m. R. 48-3 (Hogikyan Dep. at 39) (Page ID #972). After class ended, Foster and the respondent were among the last remaining students in the classroom. R. 44-21 (Mehta 4/10/14 email) (Page ID #793). Foster then entered the dining room. Professor Mehta, who had been monitoring Foster and the respondent in the classroom as planned, approached the respondent and explained that because Foster was already in the dining room, it would be impossible for the respondent to go through the line and exit the room before Foster entered. Mehta offered the respondent several alternative options for getting food from the dining room. The respondent objected to what he perceived as preferential treatment toward Foster and stated that if he did not receive an apology from the EMBA program, he would have a "response" and things would get "ugly." *Id.* The respondent did not enter the dining room and had no contact with Foster. *Id.*

Late that night, the respondent sent a crude email to various University administrators. He referred to the Title IX investigation as a "retarded witchhunt" and a "specious witch hunt," and referred to Foster as "your psycho hobeast client" and a "lying slut whore."  R. 48-20 (Respondent 4/4/14 email) (Page ID #1036).  He also stated, "[I]f you think for a minute that i am either going to miss [an upcoming social activity] or abruptly depart it just cause some lying slut whore seeks baseless vindictive retribution, well youve got an inflated sense of your own influence and with that, another thing comin. i'd recommend you protect your shrinking violet client by informing her that i will in fact be there, and if she (or you) have a problem with that, you're welcome to pound sand."  *Id.*

Upon receiving the respondent's email on Friday morning, April 4, University administrators considered whether to remove him from class that day.  R. 48-3 (Hogikyan Dep. at 77–84) (Page ID #978–79).  According to Foster, in a subsequent conversation with Hogikyan, Foster learned that on Friday morning, Veidlinger and Anthony Walesby, a University Title IX investigator, had told Hogikyan to remove the respondent from the property, but Hogikyan kept him in the classroom because she believed there was no imminent danger and she "thought removing him would escalate the situation."  R. 48-24 (Foster Notes) (Page ID #1045).[5]

---

[5]The parties dispute the veracity of the statements in Foster's contemporaneous, personal notes, *see* R. 48-2 (Foster Dep. at 186–90) (Page ID #961–62), and whether the notes are admissible evidence.  First, several University employees have testified that they did not discuss the topics that Foster says they did in her notes.  For example, Walesby and University Dean Alison Davis-Blake testified that they did not recall any conversation regarding the school lacking the resources to handle the dismissal or removal of the respondent.  *See* R. 48-4 (Davis-Blake Dep. at 17–19) (Page ID #985); R. 48-5 (Walesby Dep. at 43–44) (Page ID #987).  *But see* R. 44-4 (Veidlinger Dep. at 34–35) (Page ID #734) ("I have a general memory of discussing . . . if this was going on on the Ann Arbor campus that we would have more resources available to us quicker, that they're not there.").  At the summary-judgment stage, however, we construe all facts in the light most favorable to the non-moving party, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), so we assume that Foster's sworn recollections of the facts are true.

More significantly, the parties dispute whether Foster's personal notes are admissible evidence and/or whether they contain admissible evidence.  On the one hand, the University is correct that this record—an out-of-court statement by Foster—constitutes hearsay.  For example, the record reads:  "Claire told OIE and Allison/Valerie the school doesn't have the necessary resources to handle the situation (dismissal/removal of student) in place here in LA."  R. 48-24 (Page ID #1045).  Foster wishes to demonstrate that Hogikyan indeed made this statement—or in evidentiary terms, that this out-of-court statement is true.  Although Foster is correct that opposing party statements are admissible, *see* Fed. R. Evid. 801(d)(2), the record itself is hearsay.  However, the Supreme Court has cautioned that the party opposing summary judgment need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, a party opposing summary judgment who proffers evidence in a form not admissible at trial "must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will* be admissible

According to Foster, Hogikyan told OIE, University Dean Alison Davis-Blake, and Valerie Suslow, Senior Associate Dean of the Ross School, that "the school doesn't have the necessary resources to handle the situation (dismissal/removal of student) in place here in LA," and Davis-Blake and Suslow agreed. *Id.* Foster further recalls Hogikyan referring to "[s]omeone at Michigan" who had stated that, rather than attending the upcoming social activity with her classmates, Foster should "have her friends stay in with [her] and rent [a] movie." *Id.* Davis-Blake reportedly told the Ross School to "just get through [Friday] and then let due process kick in." *Id.*

Foster claims that during classroom breaks on Friday, April 4, the respondent violated the interim accommodations in numerous ways. First, he stood in her way of exiting the classroom; second, he stood in front of the beverage table for the duration of a break, preventing Foster from getting coffee; and third, while Foster was away from her desk, the respondent stood near or sat on her desk while speaking to the professor, preventing her from returning to the desk. R. 48-2 (Foster Dep. at 170–73) (Page ID #959–60). Later in the day, the respondent was in the lunchroom, which prevented Foster from getting her lunch. *Id.* at 173. Professor Mehta asked Foster if she needed help with getting lunch, and Foster responded, "What is happening here? None of the interim measures are being held on your end." *Id.* Foster testified that she had to be very "discreet" in this conversation because she was sitting next to two students, and they were wondering why she could not enter the lunchroom. *Id.* Foster also recalls that during a break on Friday morning, Hogikyan conveyed to her that the school advised her not to attend a karaoke gathering that evening, because the respondent would be there. *Id.* at 159–60 (Page ID #957).

That evening, the respondent attended the karaoke event he referenced in his late Thursday/early Friday email. Foster did not attend. Late in the evening, however, she notified Hogikyan that the respondent had "posted to [her] Facebook wall," calling her a "[s]crub" and making a threatening comment about her boyfriend. R. 48-22 (Foster 4/4/14 email) (Page ID

---

at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Here, the statements in the record would be admissible at trial. As a trial witness, Foster could lay a foundation for them and they could be admitted for their truth as opposing party statements. It is therefore proper for us to consider at this juncture any opposing party statements that are contained in R. 48-24.

#1040).  Foster then visited Hogikyan in her hotel room at the Beverly Wilshire.  R. 48-23 (Hogikyan 4/5/14 email) (Page ID #1044).  Hogikyan told Foster about the contents of the respondent's email from the night before and shared other emails from the respondent to the University.  R. 48-24 (Foster Notes) (Page ID #1045).  Foster told Hogikyan that she had been shaking for the last twenty-four hours and that Hogikyan was putting the entire class at risk.  *Id.*  In an email later that night to Suslow, Hogikyan confirmed that Foster had shared with her some of the text messages that the respondent had sent to Foster in the preceding months, as well as evidence that the respondent had "just posted a comment on [Foster's] Facebook wall" that night.[6]  R. 48-23 (Hogikyan 4/5/14 email) (Page ID #1044).  Hogikyan stated that Foster asked her to call security and "disallow [the respondent] into class" the next morning, and remarked, "I am inclined to agree given this new information."  *Id.*

On Saturday morning, April 5, Hogikyan called the Hyatt Regency hotel, where the respondent was staying, and asked security to go to the respondent's room and inform him that he was not to report to the Beverly Wilshire for class that day.  R. 48-3 (Hogikyan Dep. at 112) (Page ID #980).  Shortly thereafter, the respondent spoke with Hogikyan, who "informed him that he had violated the no-contact order, and, therefore, he was disallowed from attending class, and he should not come to the Beverly Wilshire that day."  *Id.*

The respondent did not attend class.  He did, however, write an email to several classmates with the subject line "Explaining my regrrtable absence today," in which he provided background on the investigation and stated that because he had violated the no-contact order, he was barred from attending class that day.[7]  R. 48-25 (Respondent 4/5/14 email) (Page ID #1047).  The email includes the following statements:  "i engaged in an inappropriate sexual relationship with our classmate rebecca foster"; "her claim . . . is false baseless and vindictive"; "Shes a mean

---

[6]It appears that Foster and Hogikyan technically mischaracterized what the respondent had done on Facebook.  Whereas Foster and Hogikyan contemporaneously referred to the respondent's action as posting a comment or post on Foster's Facebook wall, on appeal the parties agree that the respondent in fact "tagged" Foster on Facebook.  Appellant Br. at 8; Appellee Br. at 15.  Review of the relevant documents in the record—R. 48-22 (Page ID #1042–43) and R. 45-1 (Page ID #803–04)—supports the parties' characterization of the respondent's action.

[7]It is unclear from the record how many students received this email.  Nowhere in its appellate brief does the University contest Foster's statement that the email was sent to multiple students.

awful person and wackadoo chick"; "my what a time we had in her bed and mine for a few months there. I have no malice for her and shall be ever grateful for her sharing those world class tatas with me for awhile there." *Id.*

## D. Post-April Residency

After the April residency ended, the respondent sent several emails to University administrators and professors involved in his Title IX investigation. *See* R. 48-26 (Respondent 4/7/14 email) (Page ID #1049–50); R. 48-28 (Respondent 4/8/14 email #1) (Page ID #1054–58); R. 48-28 (Respondent 4/8/14 email #2) (Page ID #1053–54); R. 48-27 (Respondent 4/8/14 email #3) (Page ID #1051–52); R. 48-29 (Respondent 4/9/14 email) (Page ID #1059). The emails generally criticized the University's handling of the Title IX investigation, used aggressive language, and demanded various things from the University. The emails included the following statements:

- "You gettin this, MP? Cause I know you well enough to know that you're probably pretty pissed at the egregious mishandling of this case by your minions . . . . If I were you, I'd pick up the damn phone, stat." R. 48-27 (Page ID #1051).

- "I will graduate, with my class, in person and on time. Ms. Rebecca Foster will be barred from the premises and from all programs thereto pertaining. Or things could actually start to become slightly acrimonious, litigious, and epically embarrassing for all concerned parties." *Id.* (Page ID #1052).

- "Maybe this sordid episode will somehow make all of us better people. Want me to start writing up a case study? Wink." R. 48-28 (Page ID #1058).

- "Recommendation? Best deal with this matter sooner than later. Cause the story is growing deeply institutionally incriminating and embarrassing. And if left untended, could go hilariously viral. . . . Tick tock tick tock." R. 48-29 (Page ID #1059).

On April 10, Tim Lynch, General Counsel for the University of Michigan, wrote to the respondent and stated, in relevant part:

> The language and tone of your emails is wildly inappropriate and offensive. You are harassing others and embarrassing yourself.
>
> You will not be permitted to participate in any commencement activities.

> In addition, ***any*** further harassment by you of University faculty, staff, or students—by email or otherwise—will put your receipt of a degree in grave jeopardy.

R. 48-31 (Lynch 4/10/14 email) (Page ID #1062) (emphasis in original). The same day, Hogikyan informed Foster that the University had informed the respondent that he was barred from commencement. She added: "I don't know how close you live to him. Please exercise caution." R. 48-32 (Hogikyan 4/10/14 email) (Page ID #1064). Foster replied the following day, seeking information as to why she should exercise caution. *Id.* (Foster 4/11/14 email) (Page ID #1064). Hogikyan replied that the respondent "has demonstrated erratic behavior" and that, because of this, she "wanted to err on the side of safety." *Id.* (Hogikyan 4/11/14 email) (Page ID #1064). Hogikyan then informed the University Dean that she had communicated this information to Foster, adding, "I am concerned for her as I understand that she lives near [the respondent]." R. 48-33 (Hogikyan 4/10/14 email) (Page ID #1065). The University took steps to remove the respondent from an unidentified LinkedIn group, *id.*, and based on the content of his emails, decided to have a threat assessment conducted of him. R. 48-3 (Hogikyan Dep. at 123–24) (Page ID #981). This assessment would help determine "what our risk of him actually showing up here [for commencement] is and the degree to which we need to be concerned." R. 48-34 (Cotrone 4/11/14 email) (Page ID #1069). The University Police concluded, based on their assessment, that the respondent "was not considered a physical threat to anyone on campus." R. 48-3 (Hogikyan Dep. at 124) (Page ID #981). The University planned to have a plainclothes University of Michigan Police Department officer stationed at the Executive Residence, the official residence for the program, where Foster would be staying during commencement activities. R. 45-7 (Commencement Detail emails) (Page ID #811–12). On April 16, 2014, the respondent's attorney confirmed that the respondent would not attend commencement activities in Ann Arbor. R. 45-6 (Lowenstein 4/16/14 email) (Page ID #810).

On April 17, Foster obtained a restraining order against the respondent in Los Angeles. *See* R. 48-2 (Foster Dep. at 240) (Page ID #966).

On April 29, Foster informed Hogikyan that she had learned that the respondent would be traveling to Ann Arbor for commencement through a Facebook post and a conversation with two

other students.[8]  R. 45-9 (Foster 4/29 emails) (Page ID #815).  Foster also informed Hogikyan that she had a restraining order in place, but that she believed it only pertained to Los Angeles County.  R. 45-11 (Hogikyan 4/29/14 email) (Page ID #819).  Hogikyan testified that until it became clear that the respondent would be traveling to Ann Arbor, "[w]e were, up until that time, operating under the hope—if you will—that he . . . would follow his attorney's advice, or direction, and not come."  R. 48-3 (Hogikyan Dep. at 159) (Page ID #982).  Once Foster informed the University of the respondent's Facebook post announcing his intention to attend commencement, administrators had an "emergency get together," in which they "put . . . into action" the preparatory plan they had devised in case the respondent arrived in Ann Arbor.  *Id.* at 157, 160.

On the night of April 29, 2014, Foster was in a common-lounge area of the Executive Residence for a "graduation gathering," R. 48-41 (Police Rep. at 4) (Page ID #1101), when she saw the respondent through "a reflection in the glass" in the "same room" as her.  R. 48-2 (Foster Dep. at 238–39) (Page ID #966).  He stood up and looked at her.  *Id.*  She then went downstairs to the lobby of the hotel, where she was put in touch with Sergeant Hicks, the plainclothes officer stationed at the Executive Residence in case the respondent appeared.  *Id.*  Hicks and another officer told the respondent to leave the Executive Residence.  *Id.* at 244 (Page ID #967).  The next day, Foster provided the University with a copy of the temporary restraining order, and after it was determined that the order extended to Michigan, law-enforcement officers arrested the respondent.  *Id.* at 241; R. 46-2 (Veidlinger 4/30/14 email) (Page ID #829).  He was released into the custody of the University police department and transported to the airport to board a flight back to California.  R. 48-41 (University Police Report at 6–7) (Page ID #1103–04).

On March 10, 2017, Foster brought this action under Title IX and amended her complaint on June 14, 2017.  On November 7, 2017, the district court denied the University's motion to dismiss the amended complaint.  On February 21, 2019, the district court granted the University's motion for summary judgment.  The court explained that as a result of the University responding "promptly, compassionately, and effectively" to Foster's complaints, the

---

[8]This was not a post on Foster's Facebook wall.  Rather, it was a Facebook post on the respondent's wall that appeared on her newsfeed, R. 48 (Foster Dep. at 229) (Page ID #965), without the respondent directing it to her.

respondent's text messages to Foster, his Facebook posts mentioning her, and his physical interaction with her "all but stopped." *Foster v. Univ. of Michigan*, No. 17-CV-10781, 2019 WL 764256, at *13, 15 (E.D. Mich. Feb. 21, 2019). Under these circumstances, the court held, "it would be simply impossible" for a reasonable jury conclude that the University was deliberately indifferent under Title IX.

Foster timely appealed.

## II. DISCUSSION

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding upon a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). "'We examine the grant of summary judgment to determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *DiCarlo*, 358 F.3d at 414 (quoting *C.T. Massey v. Exxon Corp.*, 942 F.2d 340, 342 (6th Cir. 1991)) (second set of internal quotation marks omitted).

### B. Title IX Standard

In *Davis v. Monroe County Board of Education*, the Supreme Court held that Title IX may support a claim against a recipient of federal funding for student-on-student sexual harassment when the plaintiff can show (1) that the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to an educational opportunity or benefit, (2) that the funding recipient had actual knowledge of the sexual harassment, and (3) that the funding recipient was deliberately indifferent to the harassment. 526 U.S. 629, 650 (1999). On the third prong—the one most relevant here—a plaintiff may show deliberate indifference "only where the recipient's response to the harassment or lack

thereof is clearly unreasonable in light of the known circumstances." *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (quoting *Davis*, 526 U.S. at 648). "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis*, 526 U.S. at 645 (citing Random House Dictionary of the English Language 1415 (1966) and Webster's Third New International Dictionary 2275 (1961)). A school "need not . . . engage in particular disciplinary action to avoid Title IX liability." *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009) (internal quotation marks omitted); *see also S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 460 (6th Cir. 2008) (Moore, J., concurring) (describing the standard in *Davis* as "highly deferential to schools"). But "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail," the school has acted with deliberate indifference. *Patterson*, 551 F.3d at 446 (quoting *Vance*, 231 F.3d at 261).

The Supreme Court has acknowledged that "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law. *Davis*, 526 U.S. at 649. "[W]hether [a] school's belatedly stepped-up efforts were 'too little, too late,'" however, may be a question for the jury. *Patterson*, 551 F.3d at 447 (quoting *Theno v. Tonganoxie Unified Sch. Dist No. 464*, 377 F. Supp. 2d 952, 966 (D. Kan. 2005)).

## C.  Application of the Title IX Standard

We apply the three-part test set forth in *Davis* to Foster's deliberate-indifference claim. In short, we conclude that there is a genuine dispute of fact as to the third prong of the deliberate indifference test, and the district court erred in granting summary judgment in favor of the University.

### 1.  Severe, Pervasive, and Objectively Offensive Sexual Harassment

The University has waived any argument that the sexual harassment experienced by Foster was not severe, pervasive, and objectively offensive for Title IX purposes.[9]  As Foster

---

[9]The district court did not address whether Foster had demonstrated that she experienced severe, pervasive, and objectively offensive sexual harassment that deprived her of an educational opportunity or benefit.

correctly points out, in its motion for summary judgment before the district court, the University "did not argue that Foster was not the victim of student-on-student sexual harassment prohibited by Title IX." Appellant Br. at 17; *see* R. 44 (Defs. Mot. for Summary Judgment) (Page ID #626). The University never raised this point at oral argument, because the district court did not hold oral argument. *See* R. 52 (Notice of Determination of Mot. Without Oral Arg.) (Page ID #1138). The University itself makes note of our precedent that "a party who fails to raise an argument before the district court waives the right to make that argument on appeal." Appellee Br. at 27 (citing *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 326 (6th Cir. 1999)). Any argument that Foster did not experience severe, pervasive, and objectively offensive sexual harassment is therefore waived. *See Benahmed v. Houston Cas. Co.*, 486 F. App'x 508, 514 (6th Cir. 2012) ("Defendant waived the immunity argument when it failed to raise the argument in its motion for summary judgment."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996) ("Issues that are not squarely presented to the trial court are considered waived and may not be raised on appeal.").

Indeed, even on appeal, the University does not meaningfully contest Foster's ability to satisfy this requirement in *Davis*. In its brief, the University states, without elaboration or further argument: "Foster cannot establish that after the University had actual notice of the harassment she experienced severe, pervasive and objectively offensive behavior that deprived her of access to educational opportunities." Appellee Br. at 29. The only subsequent reference to this issue is in a footnote, in which the University claims that, because any interactions between Foster and the respondent during commencement weekend did not constitute severe, pervasive, and objectively offensive sexual harassment, Foster's "failure to demonstrate that she was denied access to educational opportunities provides an alternative ground for affirming [the district court's opinion]." *Id.* at 38 n.27. At oral argument on appeal, the University did not argue that the harassment was not "severe, pervasive, and objectively offensive," nor did it respond to Foster's assertion that it had failed to raise this argument below.[10] Thus, even on appeal, the University has not attempted to present an argument as to the severity requirement in *Davis*, and

---

[10]In fact, the University acknowledged at oral argument that before Foster filed a report, she suffered harassment that was "ongoing throughout the EMBA program." Oral Argument at 14:28–33, *Foster v. Univ. of Michigan*, No. 19-1314 (6th Cir. 2019), https://tinyurl.com/ygctbusf.

"[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation and quotation marks omitted).

Even if the University had not waived this argument, however, we could not conclude that, as a matter of law, Foster fails to demonstrate severe, pervasive, and objectively offensive sexual harassment. In assessing severity, we look for "something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass"; in assessing pervasiveness, we look for "*multiple* incidents of harassment; one incident of harassment is not enough"; and in assessing objective offensiveness, we look for "behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively." *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 620–21 (6th Cir. 2019). Although the causation element of Foster's deliberate-indifference claim is limited to the University's actions *after* Foster reported the respondent's conduct to OIE on March 13, 2014, as discussed below, the analysis of the severity, pervasiveness, and objective offensiveness of the harassment is not limited to events postdating March 13.[11] Thus, we first conclude that the full scope of the respondent's behavior toward Foster—meaning his harassment before and after her report to OIE—was severe and objectively offensive for Title IX purposes. From his physical sexual misconduct in the winter of 2013–2014, to his disparaging barrage of emails to Foster's classmates and professors about Foster in April 2014, the respondent's behavior clearly rose to the level of actionable sexual harassment under *Davis*. The University raises no argument to the contrary.

Our recent decision in *Kollaritsch v. Michigan State University Board of Trustees*, does not compel a different conclusion with respect to pervasiveness. In *Kollaritsch*, four female students at Michigan State University alleged that after a male student sexually assaulted them

---

[11]If anything, the open question in this circuit has been whether post-report incidents of harassment may be considered at all under the first *Davis* element. For example, in *Pahssen v. Merrill Cmty. Sch. Dist.*, we noted that the district court had properly considered whether several incidents of pre-report harassment constituted severe, pervasive, and objectively offensive conduct, but stated that "[b]oth the Appellant and the government hedge on whether we should consider the [post-report] sexual assault itself under the first *Davis* element." 668 F.3d 356, 364 (6th Cir. 2012). As the analysis herein makes clear, a court may consider pre- and/or post-report incidents of sexual harassment under *Davis*'s first element.

and they reported the assaults, the university was deliberately indifferent in its response. Because the plaintiffs could not demonstrate further harassment beyond a single incident of sexual assault, their claims were denied. Although the opinion states that *Davis* "requires that the school had actual knowledge of some actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable harassment of the student-victim," it clarifies that "pervasive," for Title IX purposes, means only that "at least one more (*further*) incident of harassment, after the school has actual knowledge and implements a response, is necessary to state a claim." *Id.* at 621. That is, rather than requiring independent proofs of severe, pervasive, and objectively offensive harassment from both before *and* after the school had actual knowledge, one post-report incident of harassment can suffice. The opinion subsequently reiterates this point, stating that a plaintiff is required to prove "*an* incident of actionable sexual harassment," "the school's actual knowledge of it," and "*some* further incident of actionable sexual harassment." *Id.* at 623 (emphases added).

In Foster's case, on March 13, 2014, the University acquired actual knowledge of a months-long campaign of sexual harassment by the respondent against Foster and implemented a response. The respondent thereafter violated the no-contact order by sending Foster a text message; announcing his intention to violate the order again in an erratic, late-night email to University administrators; tagging Foster in a threatening post on Facebook; sending retaliatory and harassing emails to Foster's classmates and professors after he was barred from the final day of the April residency; and appearing in the same room as Foster at commencement activities after being prohibited from attending commencement. Whether considering the post-March 13 conduct alone or the full timeline of the respondent's behavior, it is clear that his harassment of Foster was pervasive.

For the foregoing reasons, Foster has adequately demonstrated that she experienced severe, pervasive, and objectively offensive sexual harassment for Title IX purposes.

## 2. Actual Knowledge of the Harassment by the Institution

As a general matter, the University does not deny that it had actual knowledge of the harassment. Still, for purposes of assessing whether a jury could conclude that the University

was deliberately indifferent, two points about the University's level and timing of knowledge are worth clarifying. First, on March 18, 2014, Foster made the University aware of the hundreds of text messages that the respondent had sent to her, as an email attachment to OIE Investigator Veidlinger. R. 44-7 (Foster 3/18/14 email) (Page ID #770). From that moment onward, the University had actual knowledge of the nature of respondent's pre-report harassment of Foster.

The record does contain one apparent inconsistency on this point. In an email on April 5, Claire Hogikyan, Managing Director of the EMBA program, wrote to Valerie Suslow, Senior Associate Dean of the Ross School, that Foster had "also shared some of the hundreds of text messages [the respondent] has been sending her over the past several months," as well as evidence that the respondent had made contact with Foster via Facebook. R. 48-23 (Hogikyan 4/5/14 email) (Page ID #1044). Hogikyan stated that Foster asked her "to call security and disallow [the respondent] into class" the next morning, and concluded, "I am inclined to agree given this new information." *Id.* It thus appears that Hogikyan may not have known of the existence, or at least the substance, of these text messages until April 5. Indeed, during Hogikyan's deposition, Foster's lawyer pointed out that April 5 was the first time Hogikyan believed the respondent should be removed from the class, to which Hogikyan responded that April 5 "was the first I saw [the text messages], and the first I was ever aware of them. So leading up to this moment, I did not have any of that context." R. 44-3 (Hogikyan Dep. 95–96) (Page ID #718). That one University administrator may have been unaware of these text messages until April 5, however, does not mean the University lacked actual knowledge of them until that time, nor does the University make any such argument. The University had actual knowledge of the respondent's harassing text messages as soon as Foster provided evidence of them to OIE.

Second, Foster cannot create a genuine dispute of fact over whether the University was made aware of the respondent's alleged in-classroom violations of the no-contact order during the Friday, April 4 class session. *See Foster v. Univ. of Michigan*, No. 17-CV-10781, 2019 WL 764256, at *13 (E.D. Mich. Feb. 21, 2019) ("[Foster] does not allege that she called these violations to the defendants' attention."). These included allegations that the respondent sat on or stood near her desk while talking to the professor and that he blocked her access to the

beverage table.   The only evidence Foster sets forth of the University's knowledge of these incidents is her testimony that, when the respondent's presence in the lunchroom prevented her from getting lunch, she stated to Professor Mehta, "What is happening here?  None of the interim measures are being held on your end."  R. 48-2 (Foster Dep. at 173) (Page ID #960).  We cannot draw a reasonable inference that Foster informed Mehta of other violations besides the lunchroom issue, when in Foster's own words she did not say anything to Mehta about them.[12] *See also* R. 48-3 (Hogikyan Dep. at 185) (Page ID #983) ("Q:  During Friday classes, did Rebecca Foster ever come up to you, and report to you, that . . . she believed the interim measures were not being followed?  A:  No.").

### 3.  Deliberate Indifference to the Harassment

The central issue in this case is whether the University was deliberately indifferent to the respondent's harassment of Foster after he signaled that he would not comply with the no-contact order.  As discussed above, Foster does not argue that the nature or extent of the respondent's pre-March 13 conduct toward her should have led the university to respond differently at the moment she filed the report.  *Cf. Joyce v. Wright State Univ.*, No. 3:17-CV-387, 2018 WL 3009105, at *1 (S.D. Ohio June 15, 2018) (plaintiff alleged that university was aware of respondent's pre-university history of sexual misconduct and "was deliberately indifferent in allowing [the respondent] to enroll at WSU").  Rather, Foster frames the issue as "whether the University's subsequent actions were adequate and effective once the school was aware that the Harasser was not complying with the No Contact Order."  Appellant Br. at 14.

We first assess the various actions by the respondent and the University's responses to them, specifically inquiring whether responses were not, as a matter of law, "'clearly unreasonable in light of the known circumstances,' thus demonstrating the school's deliberate indifference to the foreseeable possibility of *further* actionable harassment of the victim." *Kollaritsch*, 944 F.3d at 621 (6th Cir. 2019) (quoting *Davis*, 526 U.S. at 643, 648).  We then

---

[12]Foster also attempts to argue that she "reported further violations of the No Contact Order to OIE." Appellant Br. at 21.  But the record she cites in support of this assertion is her email to Veidlinger in which she reported the "Really" text message on March 30, which was the same—and apparently only—violation of the no-contact order Foster reported besides the Facebook tag.  *See id.* (citing R. 48-14 (Foster 3/30/14 email) (Page ID #1027–28)).

assess whether these responses did not, as a matter of law, cause further injury to Foster, "such that the injury is attributable to the post-actual-knowledge *further* harassment, which would not have happened but for the clear unreasonableness of the school's response." *Id.* at 622. In brief, a reasonable jury could conclude that the University was deliberately indifferent in responding to the respondent's ongoing, escalating campaign of harassment against Foster.

### i. The Respondent's Actions and the University's Responses

*First*, Foster argues that after the respondent texted her on March 29 in violation of the no-contact order, the University 1) did not take any immediate action in response, and 2) did not make any substantive changes in the conditions imposed on the respondent, despite her complaints that the existing conditions did not address her safety and emotional distress concerns. Appellant Br. at 8. Instead, she claims, "OIE repeated the instructions that the Harasser have no contact with Foster and that he stay in a different hotel." *Id.* The University, by contrast, states that after the text-message incident (on March 29), it sent emails to Foster and the respondent on March 31 detailing "additional interim measures" for the upcoming residency beginning on Thursday, April 3. Appellee Br. at 9.

Although the University's March 31 email included a robust set of conditions by which the respondent was required to abide, Foster is correct that the University did not take any immediate action in response to the respondent's violation of the no-contact order. With respect to the timing of the University's response, although Veidlinger responded to Foster less than five hours after Foster informed her of the respondent's text message, the entirety of her response was that she would speak with the respondent the next day, and that Foster was "the best judge of [her] immediate needs." R. 48-14 (Veidlinger 3/30/14 email) (Page ID #1027). Veidlinger— who herself was the recipient of Foster's March 18 email providing the University with evidence of the respondent's extended harassment of Foster—did not contact the respondent immediately, nor did she respond substantively to Foster's inquiry about making further arrangements for her safety.

Furthermore, the "additional interim measures" that the University conveyed to both Foster and the respondent on March 31 were not a response to his violation of the no-contact

order, as the record reveals in three different ways. First, the record is clear that on March 28—before the respondent violated the no-contact order—University administrators had already decided to impose additional interim conditions on him. R. 48-12 (Veidlinger & Hogikyan 3/28/14 emails) (Page ID #1023–25). There is no indication in the record that the University decided to impose these conditions on the respondent only once he violated the no-contact order on March 29. Second, at no point in its March 31 email to the respondent did the University mention his violation of the no-contact order or indicate that these measures were being imposed in response to the violation. R. 48-16 (Hogikyan 3/31/14 email) (Page ID #1030). Third, in a subsequent email to Foster on April 1, Veidlinger made clear that there would be no consequences for the respondent's violation of the no-contact order. R. 48-18 (Veidlinger 4/1/14 email) (Page ID #1033) ("I spoke with the Respondent yesterday concerning the text that he sent you on Saturday. . . . We went over the no contact and retaliation provisions and I do not expect anything like that to happen again."). Thus, the additional interim measures set forth in the March 31 email did not address the respondent's March 29 violation of the no-contact order. The University's only response to this violation was to talk to the respondent and receive a verbal assurance that he would refrain from further harassment (but, as we know now, he did not).

*Second*, Foster argues that the University's response to the respondent's late-night, April 4 email to University administrators, which indicated his clear intention to continue violating the no-contact order, was "minimal." Appellant Br. at 28. In the email, the respondent refers to the Title IX investigation as a "retarded" and "specious witch hunt," and—perhaps believing that the University represented Foster—calls her "your psycho hobeast client" and a "lying slut whore." R. 48-20 (Respondent 4/4/14 email) (Page ID #1036). He also states that "if you think for a minute that i am either going to miss [the karaoke outing] or abruptly depart it just cause some lying slut whore seeks baseless vindictive retribution, well youve got an inflated sense of your own influence and with that, another thing comin. i'd recommend you protect your shrinking violet client by informing her that i will in fact be there, and if she (or you) have a problem with that, you're welcome to pound sand." *Id.* As University Title IX Investigator Anthony Walesby acknowledged in his deposition, the respondent appears to indicate in this email that he intends to violate or disregard the interim measures imposed on him. R. 48-5 (Walesby Dep. at 41)

(Page ID #987). The email clearly suggests that the University administrators were mistaken if they believed that the respondent would leave the karaoke outing if Foster were present, although the interim accommodations barred him from "attending any social activities outside of the scheduled classes where Rebecca Foster is in attendance." R. 48-16 (Hogikyan 3/31/14 email) (Page ID #1030).[13] Given the crude, threatening content of this email, University administrators discussed on Friday morning, April 4, whether to remove the respondent from class as it was happening at the Beverly Wilshire hotel. Ultimately, they decided not to. In fact, a review of the record confirms that the University took no action at all in immediate response to receiving this email.

In assessing these two incidents, it is true that a reasonable juror could regard the respondent's March 29 text-message violation as de minimis, given that the message contained only one word and no explicit threat, and could regard the April 4 email as inappropriate yet not violative of the University's orders, given that 1) the email was not addressed to Foster and 2) it only signaled the respondent's intention to violate the no-contact order *if* a certain condition were satisfied (namely, Foster showing up to the same event as him). A juror might thereby regard the University's minimal response as commensurate with a minimal amount of harassment.

Yet a reasonable juror could also conclude that, in light of the respondent's extended pattern of sexual harassment, these two incidents manifested a clear intention to subject Foster to further harassment, warranting a swift and severe response from the University as a means of deterring future misconduct. After all, "the only evidence before this Court" of the University's response to these two incidents was Veidlinger "talking to" the respondent. *Vance*, 231 F.3d at 263. This differs from a conclusion that the University was mistaken in rejecting Foster's particular requests that in-classroom security protect her, R. 48-2 (Foster Dep. at 166, 185) (Page

---

[13]There are competing facts with respect to the University administrators' perspective on the respondent's late-night missive. Hogikyan testified that the email was "unprofessional and unbecoming of an EMBA student at the University of Michigan." R. 48-3 (Hogikyan Dep. at 72) (Page ID #976). Yet she also determined that "[t]here was no impending situation in that classroom that [she] was concerned about," so it "seemed very unwise" for her to upset "what was, then, a very calm situation" by removing the respondent from the classroom in the middle of the Friday session. *Id.* at 84 (Page ID #979); *see also id.* at 74 (Page ID #977) ("Q: Did you think, at the time, about whether [the respondent] was appropriately, or inappropriately using the school's e-mail system?" . . . "A: I was not thinking about the school's email at the time."). Nor did Hogikyan form an opinion as to whether the email violated any University policy. *Id.* at 74–77 (Page ID #977–78).

ID #958, 961), or that the respondent be prevented from seeing her in person, R. 48-17 (Foster 3/31/14 email) (Page ID #1032).  Title IX does not give victims the right to "make particular remedial demands," *Davis*, 526 U.S. at 648, and Foster's "requested academic accommodation[s] . . . may not have been feasible," *Kelly v. Yale Univ.*, No. 3:01-CV-1591, 2003 WL 1563424, at *5 (D. Conn. Mar. 26, 2003).  The question remains, however, whether the University's "particular course of action" was "clearly unreasonable," and the answer to the question is not clear as a matter of law.  *Id.*

Moreover, there is a genuine dispute of material fact as to whether University administrators—including the University's dean—agreed after receiving the respondent's April 4 email that the school simply did not have the "necessary resources" to effectuate his removal from the residency given that the program was in Los Angeles, and whether they changed their minds only after his next violation of the no-contact order that night.  R. 48-24 (Foster Notes) (Page ID #1045).  Such an "admission of inadequacy" would support a finding of deliberate indifference.  *Pahssen*, 668 F.3d at 364.  A jury could conclude that the University believed removal was appropriate and failed to take this action, supporting Foster's claim of deliberate indifference.

*Third*, Foster argues that University did not respond to the Facebook-post incident, stating that after this violation of the no-contact order, "the harassment continued and escalated" and that she reported "the continued misconduct," "[y]et the school, essentially, did nothing more than restate the No Contact Order."[14]  Appellant Br. at 20.  On the one hand, the University immediately informed the respondent that he was prohibited from attending class the next day, and he complied.  *See* R. 48-25 (Respondent 4/5/14 email) (Page ID #1047).  The University also worked with hotel security to ensure that the respondent would be stopped if he tried to attend class that day.  *See* R. 48-4 (Davis-Blake Dep. at 19) (Page ID #985) ("I do recall that we had

---

[14]At first blush, it is not clear what subsequent incidents of harassment Foster is referring to, but in the same section she clarifies that, in response to the harassment, she "requested that the Harasser be prohibited from entering the class or otherwise being present near her," and that a University administrator said, "I am inclined to agree."  Appellant Br. at 20.  This describes the Facebook tag incident.  Foster reported the incident, requested that the University prohibit the respondent from entering class—as Claire Hogikyan's April 5 email confirms, Foster asked the University to "disallow [the respondent] into class in the morning."  R. 48-23 (Hogikyan 4/5/14 email) (Page ID #1044).  Hogikyan stated she was inclined to agree with this request.  *Id.*

conversations about the Beverly Wilshire having security and using that security to address issues as part of our contract with them."). On the other hand, in light of the respondent's pattern of noncompliance and the threatening nature of the Facebook post, a reasonable jury could conclude that the University's response to this incident was clearly unreasonable. The University could have barred the respondent from attending commencement at this point, rather than waiting until April 10; it could have instituted measures to ensure Foster's safety in the Los Angeles area; and it could have taken further disciplinary measures against the respondent to deter him from further harassment.

*Fourth*, Foster argues that the University's response to the respondent's retaliatory emails after being barred from the final day of the April residency was deliberately indifferent. We agree that a jury could reach this conclusion. After the respondent was barred from class, he sent numerous emails to his classmates, professors, and University administrators in which he derided the investigation against him, referred to Foster in a derogatory manner, and made statements that could be construed as threats, albeit not against Foster directly. The record contains six emails sent by the respondent between April 5 and April 9 to various individuals regarding the Title IX investigation before the University explicitly ordered him to refrain from sending these emails. *See* R. 48-31 (Lynch 4/10/14 email) (Page ID #1062) ("[*A*]*ny* further harassment by you of University faculty, staff, or students—by email or otherwise—will put your receipt of a degree in grave jeopardy.") (emphasis in original). The University had actual knowledge of each of these emails; the one email that was sent to Foster's classmates (as opposed to University employees) was "very likely" forwarded to Hogikyan by Foster. *See* R. 48-3 (Hogikyan Dep. at 110–111) (Page ID #980) ("I believe it was forwarded to me. . . . I don't recall [by] who[m]. Very likely it would have been Rebecca Foster."). The emails were not sent to Foster directly, but, as the University itself found with respect to the respondent's April 5 email to his classmates, they constituted retaliation against Foster for filing a complaint. *See* R. 48-10 (OIE Investig. Rep. at 24–25) (Page ID #1019–20). We have no difficulty concluding that these emails subjected Foster to further harassment as a continuation of the respondent's existing crusade against her.

The University discussed the possibility of removing the respondent from his University email account after he was barred from the final day of the April residency, *see* R. 48-3 (Hogikyan Dep. at 42–43) (Page ID #973), but it did not take this action. As with Foster's earlier requests for more robust accommodations, it was possible that taking this course of action would not have been feasible or proper in the absence of a formal finding by the University that Foster's complaint had merit. Yet the University apparently had substantial control over the respondent's electronic communications, as evidenced by discussions about removing him from the email system, Davis-Blake's instructions to remove him from a LinkedIn group, and Mehta providing the respondent with a local WiFi password. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 687–88 (4th Cir. 2018) (university had control over cyberharassment because, in part, harassing messages were posted "using the University's wireless network"). In our view, a jury—not this court—should determine whether the University was clearly unreasonable in allowing the respondent to continue unimpeded in his misuse of University communication systems to retaliate against Foster.

*Fifth*, Foster argues that the University "should have known it needed to take more drastic actions" with respect to the respondent's foreseeable appearance at commencement. Appellant Br. at 24. Although the University undoubtedly took several tangible steps toward ensuring that the respondent would not be present—such as confirming with his lawyer that he would not be present, stationing a plainclothes law enforcement officer at the residence where Foster stayed during commencement, and conducting a "threat assessment" of the respondent—a reasonable jury could conclude that its efforts were clearly unreasonable. The University could have taken numerous further responses, from instituting a no-trespass order at the Executive Residence against the respondent to placing him on interim suspension after receiving word that he was flying to Ann Arbor for graduation, in direct violation of the University's instruction. Furthermore, the University never restricted the respondent's presence on campus generally, only barring him from attending "commencement activities." And any significance the University ascribes to the respondent's lawyer's assurances is misplaced, given that the respondent himself had already once promised to stop violating the no-contact order (after the text-message violation), and then proceeded to break this promise. A jury could reasonably

conclude that taking the respondent or his lawyer at their word, in light of these circumstances, was clearly unreasonable.

### ii. Injury and Causation

On the questions of injury and causation, there is a genuine issue of fact as to whether the University's responses to the respondent's various actions "'cause[d] [Foster] to undergo'" harassment or "'ma[d]e [her] liable or vulnerable'" to it. *Davis*, 526 U.S. at 645 (citation omitted). Without a doubt, the question of causation may be a simpler one when the educational institution provides a lackluster response to an egregious form of sexual misconduct. For example, the minimal "talking to" employed by the school in *Vance v. Spencer County Public School District* was in response to a stabbing incident and an in-classroom sexual assault. 231 F.3d at 263. That the consequence for such violent misconduct was a talking-to from the school made the issue of causation more direct than in this case. It is more difficult to trace the University's response to the respondent's verbal harassment to the ensuing harms that befell Foster.

On the other hand, courts have concluded that educational institutions can "cause" discrimination even when the causal chain is more attenuated. In *Williams v. Board of Regents of University System of Georgia*, for example, after several students raped their classmate in a dormitory, the University of Georgia failed to take any precautions that would prevent future attacks from the assailants or "like-minded hooligans" by removing them from student housing or implementing a more protective sexual harassment policy to prevent future incidents. 477 F.3d 1282, 1297 (11th Cir. 2007). Yet the nexus between this failure and further discrimination to the victim was less clear, because she had withdrawn from UGA the day after the incident. Still, the Eleventh Circuit held that this was immaterial to causation: "[W]e do not believe that at this stage her withdrawal [from UGA] should foreclose her argument that UGA continued to subject her to discrimination." *Id.* The University's failures may have subjected the student to further discrimination "should [she] have decided to return to UGA," and this was sufficient for causation. *Id.*

Similarly, in this case, the fact that, for example, Foster did not receive additional harassing text messages from the respondent does not mean that the University's response to his violation of the no-contact order did not cause Foster to suffer further harassment. Indeed, after the University essentially let the respondent off with a warning for texting Foster, he violated the no-contact order again—this time in a more extreme, threatening fashion on Facebook. In similar fashion, soon after the University failed to reprimand the respondent for writing a threatening email involving vulgar references about Foster, he wrote a similarly vulgar email about Foster to her classmates. And after the University merely barred the respondent from class after his threatening Facebook post, he shrugged off the University's instruction that he not attend commencement activities and appeared in the same room as Foster in her residence, in apparent violation of the no-contact order, which prohibited him from "attending any social activities outside of the scheduled classes where Rebecca Foster is in attendance."

In our view, whether these incidents of post-report harassment that befell Foster were traceable to the University's responses is a question for the jury. Although a court may grant summary judgment on the issue of causation when warranted, *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996), "[o]rdinarily, causation is a question to be resolved by a jury." *Bailey v. Floyd Cty. Bd. of Educ. By & Through Towler*, 106 F.3d 135, 145 (6th Cir. 1997). Did the University's minimal response to the respondent's first violation of the no-contact order and his crude, threatening April 4 email lead to his subsequent violation of the no-contact order on April 4, 2014, when he tagged her on Facebook, referred to her as a "scrub," and threatened her boyfriend? Did the University's response embolden the respondent to engage in retaliation against her via derogatory comments about her in emails to their mutual classmates? Did the University's failure to institute more severe disciplinary and precautionary measures around the respondent's stated intention to be in Michigan for graduation lead to his appearance at the Executive Residence, in the same room as Foster? There is a genuine dispute over these questions, which a jury should answer.

\*\*\*

In response to Foster's arguments regarding the foregoing incidents, the University argues that, compared to other cases in this circuit, the post-report harm here was minimal and the University's responses were effective. Specifically, Foster did not experience any severe sexual harassment or assault after filing her report with OIE, in contrast to cases such as *Vance* and *Patterson*, in which the victims suffered severe harassment and assault from multiple perpetrators after complaining to the relevant authorities. *See, e.g.*, *Vance*, 231 F.3d at 256 (sexual assault by classmates occurred after complaint was filed); *Patterson*, 551 F.3d at 439–43, 442 (same). Furthermore, the University's actions may be contrasted with those of institutions that allegedly fail to respond to complaints or requests for accommodations in any way. For example, the University compares this case to *Kelly*, in which a student-victim of sexual assault made repeated requests for academic accommodations without any response from the University, and was successful only at receiving alternative housing (she shared a dormitory with the alleged assailant) several weeks after filing a complaint with the intervention of a university professor. 2003 WL 1563424, at \*2.

Yet the University's arguments are off-base in several respects. First, we cannot countenance the manner in which the University frames the harm that Foster endured. The University states: "While Foster focuses on Respondent's behavior throughout the EMBA program, including sending text messages and emails, unsolicited gifts, and grabbing her 'butt,' it is undisputed that no such behavior occurred after Foster finally reported the harassment and the University imposed interim measures." Appellee Br. at 38. This is incorrect. For instance, even after the University imposed the additional March 31 measures, the respondent suggested to the University that he would willingly violate the no-contact order again, and sure enough, he did, both through his Facebook post and his presence in the Executive Residence. *Cf. M.D. by & through Deweese v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 776 (6th Cir. 2017) (only post-assault contact between perpetrator and victim was perpetrator's unsuccessful attempt to "follow" victim on Instagram). That some of the respondent's continued misconduct took place over the Internet would not preclude a jury from finding that it was pervasive and deprived Foster of educational opportunities, in light of the University's deliberate indifference toward it.

*See Feminist Majority Found.*, 911 F.3d at 688–89 ("[W]e cannot conclude that UMW could turn a blind eye to the sexual harassment that pervaded and disrupted its campus solely because the offending conduct took place through cyberspace."); *Kollaritsch*, 944 F.3d at 620 n.2 ("[T]he severity of harassment on social media is virtually boundless."); *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 403 (5th Cir. 2015) (Costa, J., concurring) (discussing "the pervasive use of social media among students and the disruptive effect on learning that such speech can have when it is directed at fellow students and educators").

Second, an educational institution's complete failure to respond to a complaint or request for accommodation is not the *sine qua non* of Title IX liability.  *Any* response that is "clearly unreasonable," and subjects the complainant to further harassment, puts the funding recipient in violation of the law.  *Davis*, 526 U.S. at 649.  In this vein, the University cannot avoid liability as a matter of law when it successfully thwarts one type of sexual harassment but acts unreasonably to stop another.  We stated analogously in *Patterson* that a school district would not be shielded from liability as a matter of law "if that school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student."  551 F.3d at 448.  Here, in a similar fashion, the fact that the University was undoubtedly effective in preventing further sexual assault and severe, in-person sexual harassment against Foster does not shield it from liability if, for example, it acted clearly unreasonably in responding to the respondent's use of the phone and internet to harass Foster.  *See Soper v. Hoben*, 195 F.3d 845, 857 (6th Cir. 1999) (Moore, J., concurring in part and dissenting in part) (although school prevented recurrence of one form of sexual misconduct (rape), it took no steps to prevent another form (harassment)).

The same principle applies when "belatedly stepped-up efforts" by an educational institution ultimately stop a particular form of harassment, but a victim suffers in the meantime. *Patterson*, 551 F.3d at 447.  For example, after the University barred the respondent from the final day of the April residency, this may have caused the respondent to refrain from further direct verbal harassment of Foster.  Yet before this happened, the respondent both violated the no-contact order and penned an erratic email to the University indicating his willingness to violate the order in future, and the University's responses were negligible.  This may be

contrasted with the actions of the school district in *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834 (6th Cir. 2016), in which "each time DS or his mother communicated a specific complaint of harassment," the district not only investigated the incident promptly but disciplined the students involved. *Id.* at 849. Similarly, the University's firm instruction on April 10 for the respondent to refrain from harassing others by email was apparently effective, but it came after days of email-based retaliation. An institution cannot avoid Title IX liability if some of its responses were adequate but others were clearly unreasonable. *See E. Kentucky Univ.*, 532 F.3d at 455 (enumerating the school district's comprehensive responses to "all of the alleged incidents" involving the victim).

We hold that the University's responses to the foregoing conduct by the respondent may have been clearly unreasonable despite the fact that the harm Foster suffered was less severe than in other cases and that belated responses may have ultimately stopped certain forms of harassment from continuing.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for proceedings consistent with this court's opinion.

_____

**DISSENT**

_____

SUTTON, Circuit Judge, dissenting.  All agree that Rebecca Foster suffered peer-on-peer sexual harassment while enrolled in the University of Michigan's Executive MBA program.  The deposition testimony by Foster, assumed to be true at this stage of the case and laid out in detail in the court's opinion, shows that she suffered harassment, if not sexual assaults, from her co-student.  The question is not whether these acts counted as harassment or an assault.  If true, they most assuredly did, and Foster is free to make sure that the harasser gets what he deserves in a state court tort action.

At issue in today's case is a different question.  Was the University deliberately indifferent to her plight?  In answering that question, it's well to remember the nature of the program.  There is no campus for this MBA program for currently employed business executives.  The students attend classes roughly one three-day weekend a month at an off-site hotel in the Los Angeles area over a 21-month period.  It's also well to remember that the University did not know anything about the harassment before March 13, 2014.  At that juncture, Foster presented unspecific allegations of harassment to it.  The University did not learn the details of her plight until March 20, when she sat down for a Title IX interview.  At that point, this Executive MBA program had three more days of classes (April 3–5) and one commencement ceremony (April 30–May 1).

At each stage, the University of Michigan did not show deliberate indifference to Foster.  It ratcheted up the protections at every turn:  from a no-contact order at the outset to a requirement that the harasser stay in a separate hotel for the last three-day session to a removal from the third day of the program to an order that he not attend graduation.

*Proportionate escalation.*  Deliberate indifference, as the phrase suggests, presents a "high bar" to imposing Title IX liability on a university.  *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 848 (6th Cir. 2016).  The claimant must show that the university acted in a manner "clearly unreasonable in light of the known circumstances."  *Davis v. Monroe Cty. Bd. of Educ.*,

526 U.S. 629, 648 (1999).  It's not a university's job to do the impossible—to "purg[e] their schools of actionable peer harassment"; it's a university's job to respond in good faith to allegations of harassment to eliminate the problem.  *Id.*

That's what Michigan tried to do and tried to do in good faith.  From March 13, 2014, forward, Foster presented the University with five instances of misconduct by the harasser.  Each time, the University adopted escalating measures proportionate to the misconduct.  Not once did its action remotely count as "clearly unreasonable."

1.  Foster first notified the University that she had suffered sexual harassment on March 13, 2014, roughly two weeks before the final weekend session of her academic program, 23 days before the program ended, and 49 days before commencement.  The University opened a Title IX investigation and put in place interim protective measures.  It ordered the harasser not to contact Foster, banned him from her hotel, required him to eat meals separately from the group, instructed him to leave any social event she attended, and warned him against retaliating in any way.  The University assigned two administrators to monitor his activity and assist Foster if any issues arose.  That is not deliberate indifference.

2.  The harasser violated this no-contact order with a one-word text: "Really."  R. 44-14 at 1.  In response, the University issued a verbal warning.  The warning seemed to work.  The harasser apologized, explained that he meant to send the text to someone else, and promised that he would not make the same mistake again.  From that point on, he never again messaged Foster.  Before that, he had done so frequently; that indeed was the key source of her complaint on March 13.

The University made sure the problem did not undermine Foster's education or performance.  It excused her and her team from classroom participation, granted her extensions on assignments, and contacted her professors to apprise them of the situation.  It also offered her and the harasser the opportunity to finish their education elsewhere.  Each declined.  That is not deliberate indifference.

3.  That brings us to the last residency session, scheduled for April 3 to April 5.  No problems apparently arose during the evening session on April 3 from 5:00 p.m. to 7:00 p.m.

But on April 4, the harasser violated the no-contact order in a different manner. He "got right in [Foster's] way" during a break, stopped her from getting coffee by standing in front of the table, stood in the lunchroom, and made an offensive comment about her on Facebook. *Id.* at 20–21, 27. The University responded, this time not with a verbal warning. It banned him from all future school events—prohibiting him from attending the April 5 session and from the commencement ceremony.

The harasser did not respond well. He sent an inappropriate email to several of his classmates and several over-the-top emails to the University. In response, the University contacted his lawyer and secured the lawyer's assurance that his client would comply with the disciplinary sanctions. It then contacted campus police and asked them to conduct a "threat assessment" to determine what danger the harasser posed to Foster and others in the community. R. 48-6 at 2. Even though the assessment concluded that the harasser did not pose a risk to anyone's physical safety, the University assigned several plain-clothes officers to guard Foster during commencement. That is not deliberate indifference.

4. When Foster noticed on Facebook that the harasser appeared to be planning to attend commencement anyway, the University stepped up its efforts. It passed Foster's tip on to campus police and provided a photo of the harasser to the front desk of the hotel at which the commencement would be held and at which Foster would be staying. And it assigned a police officer to stay overnight in Foster's hotel for the duration of her visit. That is not deliberate indifference.

5. The harasser showed up at the commencement ceremony hotel. Campus police arrested him, escorted him to an airplane, and sent him back to California. Foster never interacted with him. That is not deliberate indifference.

Whether examined incident by incident or in combination, the University did its level best to protect Foster from this student harasser. It started with precautionary measures, moved to a verbal warning, and imposed a series of increasingly severe sanctions that ended with a suspension from the last class and commencement and a one-way involuntary flight back home. All the while, it took proactive measures to protect Foster's safety and academic experience.

Compare these circumstances to a case in which the school won. In *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834 (6th Cir. 2016), a school administration responded to a victim's allegations of continued peer-on-peer harassment—filed over the course of 18 months—with one verbal warning after another. *See id.* at 849. Even so, because the University went beyond "merely talking to the offender[]" and took some proactive steps to protect the victim from further harassment, we concluded it could not face damages for failing to "eliminate [his] peer harassment" altogether. *Id.* The same is true, even more true, here.

Now compare these circumstances to cases in which the schools lost. In *Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000), harassers "touched [a middle school girl] inappropriately" in "virtually every class" she attended for over a year. *Id.* at 257. Despite the victim and her mother's repeated complaints to school officials, they responded only with a string of verbal warnings. "[T]he more [the victim and her mother] complained," the more the harassment "seemed to increase." *Id.* In that context, we found the school's pattern of non-responses deliberately indifferent—and properly so. *Id.* at 262–63. Likewise, in *Patterson v. Hudson Area Schools*, 551 F.3d 438 (6th Cir. 2009), the victim suffered years of "persistent harassment," *id.* at 448, that included "daily" bullying, physical assault, and sexual assault, *id.* at 439. We found deliberate indifference because the school's "only response" to the victim and his mother's pleas for help was to "employ the same type of verbal reprimands" that had already proven inadequate. *Id.* at 449. To describe the facts in these cases is to distinguish them from Foster's case.

*Lack of better alternatives.* What at any rate could the University have done differently? That of course is not the test. A Title IX plaintiff has no right to insist on "particular disciplinary action[s]." *Davis*, 526 U.S. at 648; *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 365 (6th Cir. 2012). But it's still worth asking the question because, if the claimant can't identify a better approach, it follows that no deliberate indifference occurred. Foster complains of several roads not taken. None advances her case.

Start with her suggestion that the University could have suspended the harasser. But didn't it do exactly that? At the outset, it banned him from staying at the hotel. Then, after he violated the no-contact order, it banned him from attending any remaining classes and from the

commencement ceremony. That means he could not attend *any* official school events, which surely counts as a suspension, as any parent of a trouble-making student could attest.

If Foster means to say that the ban came too late, that too defines deliberate indifference down—and unfairly so. At the time the University issued its no-contact order, it had no reason to believe the harasser would refuse to abide by the order's terms. From that point on, after the "Really" text, it gave only one verbal warning before removing him from the classroom for good. Even then, it stopped at a verbal warning only after receiving an apology and assurances that the incident would not repeat. While we have cautioned schools against relying on verbal warnings that continued not to work, *see, e.g.*, *Patterson*, 551 F.3d at 449; *Vance*, 231 F.3d at 257, we have never suggested that schools cannot employ *one* verbal warning before turning to harsher sanctions. Wherever the threshold for deliberate indifference lies, this does not cross it as a matter of law.

What about Foster's suggestion of "immediate expulsion"? R. 18 at 13. That is a heavy lift in a case in which the claimant first told the University about the problem two weeks before the last three-day session and in which it did suspend the harasser when the initial steps did not work. The harasser has statutory and constitutional rights too, as we well know, particularly in the context of such serious allegations. Alleged harassers have not been shy about suing administrations under Title IX and § 1983 for denying them educational opportunities without the requisite notice and process. *See, e.g.*, *Doe v. Baum*, 903 F.3d 575, 580 (6th Cir. 2018). Foster's harasser threatened to join this number, forcing the University to hold the thin line between protecting Foster and denying the harasser process before expelling him. If there is one thing sure to come out of today's decision, it will be a university's decision to expel first and to ask questions later. Because these cases often generate triable issues of fact, a pattern accentuated if we dilute deliberate indifference into mere reasonableness, one wonders when the day will come that two different juries will find that the same school loses coming and going over the same incident—by insufficiently protecting the rights of the victim in one case and by insufficiently protecting the rights of the accused in the other.

One thing more on this score. Expulsion would not have prevented many of the harassing acts—the "Really" text, the Facebook post, and the trip to Ann Arbor on the weekend

of the graduation ceremony—because they lay beyond the school's control.    Immediate expulsion would not have secured Foster any quantum of protection that the suspension did not.

That leaves the suggestion that the University should have secured a no-trespassing order against the harasser after banning him from commencement.    But the harasser gave the University no reason to believe he would attend the ceremony.    And the University did not act clearly unreasonably in taking an officer of the court—his lawyer—at his word when he assured the school that his client would not fly from Los Angeles to Ann Arbor for the event.    A no-trespassing order would not have changed things anyway.    Even without this order, the University took numerous steps to provide for Foster's safety, such as having campus police stay overnight in her hotel and positioning them near her at the event.    These measures worked. When the harasser showed up, campus police arrested him and flew him back home.    He never interacted with her.

*Causation*.    Foster also must show causation.    She must establish (1) that she sustained a cognizable injury—a "deprivation of 'access to the educational opportunities or benefits provided by the school,'" *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 622 (6th Cir. 2019) (quoting *Davis*, 526 U.S. at 650)—and (2) that the school caused that injury—that it stemmed from "post-actual knowledge further harassment" that "would not have happened but for the clear unreasonableness of the school's response," *id.* (emphasis removed).

Foster's complaint does not allege that the harassment occurred within a forum the University had the power to do anything about.    Title IX deliberate indifference claims make sense "only where the [school] has some control over the alleged harassment," *Davis*, 526 U.S. at 644, and that does not describe this situation.    The harasser, sure enough, retaliated against Foster by making inappropriate comments to her classmates on Facebook and over email.    But the school could not force him to divulge his Facebook credentials.    Nor could it prevent him from emailing his classmates, whose addresses he already had.

The court's contrary suggestions fall short.    It points to discussions among administrators about possibly terminating the harasser's school email account.    But there's no suggestion in the complaint or in the record that this would protect Foster in any meaningful way.    All but one of

the abusive emails went directly to the University. And it had no choice but to continue dialogue with the harasser. After all, it had a Title IX investigation to conduct. The court adds that the University provided the harasser with Wi-Fi for the final residency session. True enough. But that event predated the conduct that led to his removal from class. Attending business school without internet access makes little sense.

By enforcing its no-contact order through escalating sanctions, the school did all it could to help Foster. Additional help required additional means of redress: blocking the harasser's Facebook posts or getting a no-contact order from a state court. Frustrating as all this may seem, only the victim, not the University, had access to these other solutions.

Under Title IX, a school may be held liable only for what it can control. The University of Michigan did not show deliberate indifference when it comes to that duty and the limits on that duty.

I respectfully dissent.